IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| LUTRON ELECTRONICS CO., INC., | **MEMORANDUM DECISION AND ORDER** |
| Plaintiff, | |
| v. | Case No. 2:09-cv-00707 CW |
| CRESTRON ELECTRONICS, INC. et al., | Judge Clark Waddoups |
| Defendants. | |

## INTRODUCTION

This case is before the court on claims for patent infringement.  During a hearing on June 26 through June 28, 2013, the court addressed two motions for summary judgment, a motion to strike, and five *Daubert* motions.  Although most issues were resolved during the hearing, the court took several matters under advisement.  This memorandum decision addresses Crestron's motion for summary judgment on Lutron's claim that it infringed U.S. Patent No. 5,905,442 (the '442 Patent) and the date by which Crestron may be liable for inducing infringement.  It also addresses Crestron's challenge to two expert opinions about the non-obviousness of the '442 Patent.  For the reasons discussed below, the court denies Crestron's motion for summary judgment on Lutron's claim for direct infringement, but limits the acts that infringe to those where a control device was coupled, by wire, to an electrical device.  Because material issues of fact exist regarding when Crestron may be liable for inducing infringement, the court denies summary judgment on that issue.  Finally, the court concludes the two experts may not opine on whether there is a nexus to commercial success.  If

sufficient foundation is laid, however, they may testify about copying as an indicium of non-obviousness.

## FACTUAL BACKGROUND

The '442 Patent provides a "method and apparatus for controlling and determining the status of electrical devices from remote locations." '442 patent, 2 (Dkt. No. 177, Ex. A). Lutron asserts its RadioRA and Homeworks Wireless products embody the '442 Patent. The RadioRA product provides a "whole-home wireless lighting control system" that "uses light switches and dimmers that include a tiny two-way radio, in communication with master units and repeaters, to create a lighting control network." Lutron Mem. in Opp'n to Mot. for Sum. J., at v (Dkt. No. 474). The Homeworks Wireless product is similar to RadioRA, but it allows "for larger applications" and "all communications are actively managed by a central processor." *Id.*

Lutron also holds U.S. Patent No. 5,982,103 (the '103 patent). The '103 Patent is specific to a control device, such as dimmers and switches, that employs an antenna and fits at least partially within the small area of an electrical wall box. *See* '103 Patent, col. 1:26 32 (Dkt. No. 177, Ex. B). The RadioRA and Homeworks Wireless products are marked not only with the '442 Patent, but with the '103 Patent as well.

## ANALYSIS

I.    MOTION FOR SUMMARY JUDGMENT OF NON-INFRINGEMENT OF U.S. PATENT NO. 5,905, 442[1]

A.    Control Device Coupled to an Electrical Device

Crestron contends it cannot be liable for direct infringement of the '442 Patent because none

---

[1] Dkt. No. 424.

of its products meet all of the structural limitations of the '442 Patent.  Some claims in the '442 Patent are apparatus claims; others are method claims.  The court focuses on the apparatus claims first.

        i.    <u>Claims 1 and 62</u>

Claims 1 and 62 of the '442 Patent address an "[a]pparatus for controlling at least one electrical device by remote control."  '442 Patent, col. 34:39  40, col. 39:37  39 (Dkt. No. 177, Ex. A).  The claims state, in relevant part, that the apparatus is comprised of "at least one *control device coupled to the electrical device* by a wire connection for providing power to the electrical device." *Id.* at col. 34: 41  43 (emphasis added).  Crestron contends that it does not make, use, offer for sale, or sell any products that have a control device connected by wire to an electrical device.  Crestron argues that it sells its control devices only to distributors who ultimately connect it to an electrical device.  It therefore contends it cannot be liable for direct infringement.

The Federal Circuit has cautioned that "in every infringement analysis, the language of the claims, as well as the nature of the accused product, dictates whether an infringement has occurred." *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1204 (Fed. Cir. 2010) (quotations and citation omitted).  Here, the issue before the court is whether a "control device coupled to the electrical device" must be structurally present in the apparatus or whether the apparatus must merely be capable of satisfying this claim limitation for it to infringe directly.  If the claim merely recites capability, then "an accused device need only be capable of operating in the described mode" for infringement to occur.  *Id.* (quotations and citation omitted).  Crestron contends, however, that Claims 1 and 62 do not merely recite capability.  Instead, Crestron argues these claims require the control device actually to be connected, by wire, to an electrical device for direct infringement to

occur.

"To infringe an apparatus claim, the device must meet all of the structural limitations." *Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1311 12 (Fed. Cir. 2005) (citations omitted),  Typically, an apparatus claim "depend[s] upon structural limitations and not upon statements of function." *In re Michlin*, 256 F.2d 317, 320 (C.C.P.A. 1958) (citations omitted); *see also Hewlett-Packard Co. v. Bausch & Lomb Inc.*, 909 F.2d 1464, 1468 (Fed. Cir. 1990) (stating "apparatus claims cover what a device *is*, not what a device *does*") (emphasis in original); *but see Finjan, Inc.*, 626 F.3d at 1204 05 (focusing on an apparatus claim's functionality).  The Federal Circuit applied this concept in *Cross Medical*.

The patent at issue in that case "involve[d] orthopedic surgical implants used to stabilize and align the bones of a patient's spine." *Cross Medical*, 424 F.3d at 1297.  The relevant claim language stated the apparatus was comprised of "an anchor seat means which *has* a lower bone interface *operatively joined* to said bone segment." *Id.* at 1303 (emphasis added).  The Federal Circuit concluded the "lower bone interface" met the requirement of being "operatively joined" only "when the interface and the bone segment are connected and in contact." *Id.* at 1306.  Cross Medical argued, however, that Medtronic infringed its patent because Medtronic's device was capable of being operatively joined to the bone segment by a surgeon.  While Medtronic's device may have been capable of that, the Federal Circuit concluded the claim embodied a structural limitation. *Id.* at 1312.  Thus, mere capability was not enough for direct infringement.  Because the "anchor seat of the device [did] not contact bone until the surgeon implant[ed] it," the Court concluded Medtronic did not directly infringe. *Id.*

Lutron contends *Cross Medical* is inapplicable, and instead, cites *Finjan, Inc.* to support that

-4-

the '442 Patent simply explains how the apparatus works rather than requiring installation as is required for a method claim.  The Finjan patents "involv[ed] proactive scanning technology for computer security."  *Id.* at 1200 (quotation omitted).  Finjan Patent No. 6,092,194 (the '194 Patent) included both method and apparatus claims.  *Id.* at 1201.  Claim 32 of that patent stated the following:

> A system for execution by a server that serves as a gateway to a client, the system comprising:
> a        security policy;
> an      interface *for receiving* an incoming Downloadable addressed to a client;
> a        comparator, coupled to the interface, *for comparing* Downloadable security profile data pertaining to the Downloadable, . . . ; and
> a        logical engine *for preventing* execution of the Downloadable by the client if the security policy has been violated.

'194 Patent, col. 11:36  51 (emphasis added).

The Court concluded the claim "describe[d] capabilities without requiring that any software components be 'active' or 'enabled.'"  *Id.* at 1204  05.  It based its conclusion on the fact that the apparatus claim focused on reciting the purpose of the components.  For example, "a logical engine *for preventing* execution" did not require the engine to be actively preventing execution, but only that it be capable of performing that function.  *See id.* at 1205 (emphasis in original).  It likened the claim limitation to "an automobile engine for propulsion."  *Id.*  Such an engine "exists in a car even when the car is turned off."  *Id.*  The engine does not have to be actually propelling the car in order for it to be an engine for propulsion.

Lutron contends that Claims 1 and 62 of the '442 Patent likewise focus on functionality when they describe a control device that provides power to the electrical device.  Indeed, the *capability* for powering an electrical device exists even when the power is turned off.  Consequently, if the relevant

claim limitation at issue here were "at least one control device . . . for providing power to the electrical device," the court would agree that *Finjan* is applicable because that phrase recites capability rather than a structural limitation.  The power does not have to be active or enabled   it is sufficient that the control device be capable of providing power to the electrical device.  But that is not the relevant phrase; Crestron does not challenge the purpose or function of the control device.  Instead, it focuses on a different limitation, namely, a control device *coupled* to the electrical device.

That fact is important because whether a claim addresses structure or capability may vary depending on what limitation is at issue within the claim.  For example, Claim 32 of the Finjan '194 Patent describes "a  comparator, coupled to the interface, for comparing Downloadable security profile data pertaining to the Downloadable . . . ."  The comparator has two limitations.  First, it must be coupled to the interface.  Second, its purpose is to compare Downloadable security profile data.  If the challenge in *Finjan* had been on whether a comparator had to be coupled to the interface, the answer would have been "yes" because the first limitation does not merely allow for the possibility that the comparator might be coupled to the interface.  Rather, it declares that the comparator be coupled to the interface.  That is a *structural* requirement that must be present before direct infringement may occur.

The challenge in *Finjan*, however, was on the second limitation and whether the software components had to be active or enabled versus merely being capable of comparing Downloadable security profile data before direct infringement could occur.  *See Finjan*, 626 F.3d at 1204 05.  While the second limitation   i.e. "for comparing . . ."   required that the comparator be capable of comparing the proper information, the phrase described a functional requirement, not a structural limitation that had to be actively working at all times.  Hence, the Court's conclusion that the claim

-6-

described "capability" depended on the fact that the challenge was to the claim's second limitation and not to its first.

In this case, the control device likewise has more than one limitation associated with it. "At least one control device coupled to the electrical device by a wire connection," is one limitation. Another limitation states the purpose of the control device is "for providing power to the electrical device." Crestron's challenge is to the first limitation. But Lutron contends the two limitations should be read together, such that the coupling merely informs how to carry out the purpose of providing power, rather than requiring actual coupling before direct infringement may occur. As in *Finjan*, however, the claim language does not merely allow for the possibility that a control device might be engaged so as to connect to an electrical device. It declares there is at least one control device coupled, by wire, to the electrical device in the same manner that the patent in *Cross Medical* declared the "lower bone interface" had to be "operatively joined" to a bone segment. This is a structural limitation. While the court recognizes the "electrical device" is not part of the '442 Patent, neither was the bone segment part of the device in *Cross Medical*. Nevertheless, the Court in *Cross Medical* held that direct infringement could not occur absent joinder to the bone.

In choosing the claim language, the patentee in *Cross Medical* had elected language that required actual joinder rather than merely being capable of joinder. Having set those parameters, the patentee could not later modify the scope of its claim based on how a competitor designed its product. Lutron likewise chose its claim language and the corresponding parameters of it. In so doing, it chose a structural limitation. Thus, even if the very purpose of Crestron's accused devices were to connect to an electrical device, direct infringement still cannot occur until the control device actually is coupled, by wire, to the electrical device.

-7-

It bears noting that the purpose behind Crestron's actions does not inform the court about what a patent term means, nor does it alter the patent's language. Instead, it informs the court about Crestron's intent in developing, manufacturing, and selling the accused devices. But intent is an element of indirect infringement, not direct infringement. The patent laws will best serve their purpose if the distinctions between the different causes of action are observed. The court therefore concludes that unless Crestron made, used, offered for sale, or sold a product that was coupled to an electrical device, it cannot be liable for direct infringement of the '442 Patent under Claims 1 and 62.

      ii.    <u>Claims 151 and 156</u>

Claims 151 and 156 of the '442 Patent address the specific wiring configuration of the control device. Both claims require "said lighting control device being connected to a line voltage hot lead and to the first lead of the electric lamp." '442 Patent, col. 47:45 47, col. 48:8 9 (Dkt. No. 177, Ex. A). Based on the same analysis stated above, the court concludes the relevant phrase likewise refers to a structural limitation rather than capability.

      iii.    <u>Claims 32 and 84</u>

Claims 32 and 84 of the '442 Patent differ in nature because they are method claims. These claims require "coupling at least one control device to the electrical device by a wire connection for providing power to the electrical device." A method claim "require[s] performance of each claimed step" for infringement to occur. *Finjan*, 626 F.3d at 1204 (citation omitted). Consequently, Lutron concedes that "coupling" is required for direct infringement to occur under these claims. *See* Lutron Mem. in Opp'n to Mot. for Sum. J., at 9 (Dkt. No. 474).

iv.   Evidence of Direct Infringement

Lutron has come forward with evidence to show that Crestron has installed certain commercial systems.  To the extent Crestron has coupled a control device to an electrical device, by wire, at a trade show, commercial project, or other similar venue, and met the other patent limitations, a reasonable fact finder may conclude that Crestron is liable for direct infringement.[2] Crestron is therefore not entitled to summary judgment on this issue.

**B.   Master Control Unit**

Crestron also contends it is not liable for direct infringement because its products do not have a master control unit, with a status indicator that indicates the status of the electrical device.  At the hearing, the court ruled that material issues of fact exist with respect to (1) whether a master control unit may be comprised of three separate components and (2) whether Crestron's products have a status indicator that indicates the status of the electrical device in response to the status information.[3] *See* Hearing Tr., at 32:8 19, 33:25 34:6 (Dkt. No. 711).

Although the court has concluded that material issues of fact exist with respect to these questions, that ruling should not be construed to mean that direct infringement may occur only if the status indicator is actually indicating the status of the electrical device.  With respect to the master control unit, the relevant claim limitations are "a master control unit having" (1) a "status indicator thereon," and (2) a "status indicator indicating the status of the electrical device in response to the

---

[2]  Even if Lutron is not able to establish that Crestron, itself, has coupled a control device to an electrical device, by wire, Crestron may still be liable for induced infringement if Lutron shows that dealers or end users did so.

[3]  The latter issue will depend on whether Crestron's configuration file is more like a program capable of showing status when that feature is selected or if it is simply a compiler that provides a means for programming a feature into a device.

status information." '442 Patent, col. 34:57 58, 63 65 (Dkt. No. 177, Ex. A).  The first limitation

is a structural requirement that a master control unit have a status indicator thereon.  Based on the

analysis in *Finjan*, however, the second limitation merely requires that the master control unit have

the capability for indicating the status of the electrical device.  It does not require that the indicator

be continuously active or enabled for direct infringement to occur.  Hence, if a Crestron product has

a status indicator on the master control unit that is *capable* of indicating the status of the electrical

device in response to the status information, Crestron may be liable for direct infringement if its

products meet the other patent limitations as well.  Accordingly, Crestron is also not entitled to

summary judgment on the issues involving the master control unit.

### C.        Potential Liability for Inducing Infringement Prior to March 23, 2007

Next, Crestron contends it cannot be liable for induced infringement prior to March 23, 2007

because it had no knowledge of the '442 Patent before that date.  The Supreme Court has stated "that

induced infringement under [35 U.S.C. § 271(b)] requires knowledge that the induced acts constitute

patent infringement." *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2068 (2011).  This

means an infringer must have had knowledge of the patent at the time it induced another to infringe

it.  *See id.* at 2067 68.  Knowledge may be proved by evidence of actual knowledge or by willful

blindness.

Willful blindness requires proof of two elements: "(1) the defendant must subjectively

believe that there is a high probability that a fact exists and (2) the defendant must take deliberate

actions to avoid learning of that fact."  *Id.* at 2070.  Thus, parties cannot escape liability "by

deliberately shielding themselves from clear evidence of critical facts that are strongly suggested by

the circumstances."  *Id.* at 2068 69.  This is a higher standard than recklessness or negligence

-10-

because one "can almost be said to have actually known the critical facts," when the person "takes deliberate actions to avoid confirming [them]." *Id.* at 2070 71. In "contrast, a reckless defendant is one who merely knows of a substantial and unjustified risk of such wrongdoing." *Id.* at 2071 (citation omitted).

In this case, Lutron's infringement contentions assert that a March 23, 2007 e-mail shows Crestron had knowledge of the '442 Patent by March 2007. Lutron's Infringement Contention, at 12 (Dkt. No. 428, Ex. 9). Based on that contention, Crestron asserts it cannot be liable for induced infringement prior to March 23, 2007. Lutron's contention, however, did not set that date as the boundary for liability. Instead, Lutron further contends that Crestron had either actual knowledge or willful blindness from the point in time that Crestron launched its accused products. *Id.*

Lutron has presented sufficient evidence to show that material facts are in dispute on this issue. *See* Lutron Mem. in Opp'n to Mot. for Sum. J., Response to Fact No. 20, at xvii  xviii (Dkt. No. 474). Lutron was Crestron's competitor. E-mails show that Crestron was aware of Lutron's products and those products had the '442 Patent marking on them. Moreover, industry publications reported on two different lawsuits Lutron filed for infringement of the '442 Patent. A reasonable fact finder could infer from this evidence that Crestron engaged in willful blindness if it did not have actual knowledge of the patent until March 2007. The court therefore denies summary judgment on this issue.

## II.    MOTION TO PRECLUDE THE TESTIMONY AND OPINIONS OF DR. NEIKIRK AND DR. LEEB ABOUT NON-OBVIOUSNESS OF THE '442 PATENT[4]

Crestron seeks to invalidate the '442 Patent based on obviousness grounds. To invalidate

---

[4] Dkt. No. 555.

a patent claim based on obviousness, a challenger must demonstrate that a person skilled in the art "would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and that the [person] would have had a reasonable expectation of success in doing so." *Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1360 (Fed. Cir. 2012). (quotations and citation omitted); *see also* 35 U.S.C. § 103(a) (stating when a patent is obvious). The Supreme Court has set forth four factors that must be considered when evaluating obviousness. *Graham v. John Deere Co. of Kan. City*, 383 U.S. 1, 17 18 (1966). The fourth factor evaluates "objective indicia of nonobviousness," which may include such things as "(1) commercial success; (2) long felt need: (3) copying; (4) unexpected results; (5) acceptance by others; and (6) initial skepticism [in the industry]." *Kinetic Concepts, Inc.*, 688 F.3d at 1367.

Lutron has offered the opinions of Dr. Dean P. Neikirk and Dr. Steven B. Leeb to show the '442 Patent was not obvious. Crestron has moved to strike a portion of their respective opinions. At the hearing on the motion, the court concluded the experts[5] were qualified to offer their opinions on most factors that were challenged, but precluded their testimony about *why* other companies entered into a license agreement with Lutron. Hearing Tr., at 36 (Dkt. No. 711). The court also took two issues under advisement as discussed below.

## A.  Testimony About a Nexus Between the Patented Product and Lutron's Commercial Success

The court ruled that Dr. Neikirk and Dr. Leeb may testify about certain aspects of commercial success, but took under advisement whether they could opine that there is a *nexus* between the

---

[5]  The court only referred to Dr. Neikirk when it made its ruling from the bench. The court clarifies that its ruling extends to Dr. Leeb as well since both experts have similar qualifications and employed similar methodology.

patented product and Lutron's commercial success.  Hearing Tr., at 36  37 (Dkt. No. 711).  Crestron contends these experts lack the specialized knowledge necessary to opine on the issue.  Crestron also contends the methodology they used to analyze this issue is unreliable.  The court agrees.

      i.      <u>Commercial Success Must Be Based on the Claimed Invention</u>

"The commercial success of a product can have many causes unrelated to patentable inventiveness . . . ." *Ritchie v. Vast Res., Inc.*, 563 F.3d 1334, 1336 (Fed Cir. 2009).  Consequently, to establish non-obviousness, "[c]ommercial success is relevant only if it flows from the merits of the *claimed* invention."  *Sjolund v. Musland*, 847 F.2d 1573, 1582 (Fed. Cir. 1988) (emphasis in original).  If the commercial success is due to "a feature not claimed," then such success is irrelevant because there is no nexus between the commercial success and the claimed invention.  *Id.*; *see also Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir. 1988) (stating there must be "a legally and factually sufficient connection between the proven success and the patented invention").  Similarly, commercial success driven by advertising, contractual relations, company reputation, workmanship, and so forth also is irrelevant in showing that a claimed invention was non-obviousness because the invention did not drive the success.  *Demaco Corp.*, 851 F.2d at 1392; *see also Rambus Inc. v. Hynix Semiconductor Inc*., 254 F.R.D. 597, 604 (N.D. Cal. 2008).

To establish a nexus, an expert must have the requisite expertise to explain to the jury why the commercial success is due to the claimed invention rather than an unclaimed feature or other external factors.  While this does not mean that an expert must prove "the negative of all imaginable contributing factors," *Demaco Corp*., 851 F.2d at 1394, an expert must be qualified to do more than state a product incorporates a claimed invention; the product is successful; therefore the invention

must have caused the commercial success.  *See Rambus Inc.*, 254 F.R.D. at 605.

ii.       Factors Relied on by Dr. Neikirk and Dr. Leeb to Show Nexus

a.       *Patented Products Command a Premium Price*

When a patented product commands a market premium over a similar product that does not practice the patented feature, this provides evidence that a nexus exists between the claimed invention and the patented product's commercial success.  *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*, 699 F.3d 1340, 1350 (Fed. Cir. 2012).  According to Dr. Neikirk and Dr. Leeb, Lutron's RadioRA and Homeworks Wireless *dimmers* (collectively "RF dimmers") are substantially more expensive than Lutron's Maestro *dimmers*, which do not have the capability to be wirelessly networked or to provide remote control and status feedback like the RF dimmers. Because the RF dimmers command a premium price over the Maestro dimmers, the experts contend this shows there is a nexus between the '442 Patent and the products' commercial success.

The RadioRA dimmers are marked with ten different patents, of which three are related to radio frequency communication (collectively the "RF Patents").  The '442 and '103 Patents are two of the RF Patents listed on the RadioRA dimmers.  The '442 Patent focuses on a system while the '103 Patent focuses on a control device, such as a dimmer or a switch, which is useful in a '442 system.  The Maestro dimmers are marked with many of the same patents listed on the RadioRA dimmers, but notably, none of the RF Patents are listed on the Maestro dimmers because those dimmers do not practice the RF Patents.  Dr. Neikirk and Dr. Leeb opine that this shows the '442 Patent is driving the commercial success of the RadioRA dimmers.  They do not account, however, for the '103 Patent even though it is specific to dimmers.  In other words, they undertook no analysis to determine whether the RF dimmers' commercial success was due to the '442 Patent, the '103

Patent, or both.

Lutron contends "it is absurd that Dr. Leeb would need to *quantify* whether it was the '442 patent or another RF patent that was responsible for the commercial success of Lutron's RF products." Lutron Mem. in Opp'n to Mot. for Sum. J., at 5 (Dkt. No. 474). As stated above, an expert does not have to prove "the negative of all imaginable contributing factors." *Demaco Corp.*, 851 F.2d at 1394. Therefore, precise quantification as to why a product is successful is not required. When a product is marked with multiple patents, however, it is more difficult to establish a nexus between commercial success and the relevant claimed invention. *See* 2-5 *Chisum on Patents* § 5.05[2][f][ii] (2013) (citing *Polaroid Corp. v. Eastman Kodak Co.*, 641 F. Supp. 828, 833 (D. Mass. 1985)). This is particularly so here where the experts' analysis focused on the RadioRA *dimmers* rather than the *system* contemplated under the '442 Patent.

Because both the '442 and '103 Patents involve radio frequency communication, products practicing the inventions may be retrofitted into existing homes without rewiring.[6] But it is the '103 Patent that teaches a dimmer adapted to be mounted at least partly within the area of existing electrical wall boxes. Absent this feature, the ease of retrofitting a home with the RadioRA system may not have been as great or as desirable. This is an example of why an analysis is necessary to determine what feature or patent is driving the commercial success of a product. Neither expert

_____

[6] The '442 Patent does not claim retrofittability as an element of the patent. Although commercial success due to unclaimed features cannot support a non-obviousness determination, this does not mean "that *advantages* inherent in what *is* specifically disclosed in a patent are not to be considered in determining non-obviousness." *In re Vamco Mach. & Tool, Inc.*, 752 F.2d 1564, 1577 n.5 (Fed. Cir. 1985) (emphasis in original). The '442 Patent claimed features include control over an electrical device via a radio frequency transmitter/receiver. This patent feature enables one to install and use the system without rewiring the home. Thus, retrofittability is an advantage inherent in what is specifically disclosed by the '442 Patent and may be considered under the commercial success nexus analysis.

undertook this analysis.[7]

> b.    *Sales Data*

Both experts also cite to Lutron's total sales of the RadioRA and Homeworks Wireless products to prove a nexus.  Total sales differ in nature from whether a product commands a premium price.  Again, commercial success alone does not prove a nexus because it may be based on factors other than the claimed invention.  Indeed, the Lutron sales data itself calls into question whether the '442 Patent was driving the RF Products' commercial success.  The '442 Patent application was filed in 1996 and it issued in 1999.  Lutron began marketing its RadioRA product in 1997.  Sales steadily increased until about 2007, and then started to decline.  In 2009, Lutron launched RadioRA2.  This second generation product has proven to be even more successful than its predecessor in terms of yearly sales.  If the '442 Patent were driving the commercial success of RadioRA and RadioRA2, rather than some other factors, it begs the question why RadioRA2 yearly sales are so much higher than RadioRA sales.  Neither expert accounts for this in their reports.

> c.    *Lutron Employee Statements, Lutron Press Releases, and Industry Recognition*

Dr. Neikirk also cites to statements from Lutron engineers and Lutron's press releases to support the '442 Patent features are driving the RF Products' commercial success.  Testimony from company employees may be helpful when analyzing commercial success, provided the testimony is

---

[7] Dr. Leeb does address that the Homeworks Wireless *system* commands a premium over the Homeworks *system*, where the distinguishing factor between the two products is that the Homeworks system is a wired system that does not practice the '442 Patent.  As stated at the hearing, as long as sufficient foundation has been laid, Dr. Leeb or Dr. Neikirk, may testify about the differences between the different products, what features are important in the industry, and the pricing differences.  Hearing Tr., at 36 (Dkt. No. 711).  For the reasons stated in section II(A)(iii), however, they may not opine that a nexus exists.

-16-

based on proper factors.  For example, in *Transocean Offshore Deepwater Drilling, Inc.*, employees testified that certain product features were added to dual-activity drilling rigs "based on market surveys showing customer demand for this feature." 699 F.3d 1350.  Moreover, once the features were added, customers specifically requested the particular feature.  *Id.*

In contrast, the statements by Lutron engineer Bob Newman focus on his "personal opinion" and "personal choices for characteristics that would . . . lead to success."  Neikirk Expert Report, at 40  42 (Dkt. No. 555).  Eric Lind testifies, without foundation, what features Lutron "believes has led to its commercial success."  *Id.* at 42  43.  Dr. Neikirk asserts a 1998 Lutron press release and industry recognition support the characteristics named by these two engineers.  Again, however, such information encompasses both the '442 Patent and the '103 Patent, especially when a end-user comments that the system works because of "tiny transmitters/receivers stealthily stashed inside each RA unit."  *Id.* at 43.  This comment goes to the hallmark features of the '103 Patent, not the '442 Patent.  It is therefore unclear what features drove Lutron's commercial success.

iii.    Expertise in the Relevant Area

Rule 702 of the Federal Rules of Evidence "recognizes that people develop expertise in many ways and permits an expert to testify based on 'knowledge, skill, experience, training, or education.'" *Rambus Inc. v. Hynix Semiconductor Inc.*, 254 F.R.D. 597, 604 (N.D. Cal. 2008) (quoting Fed. R. Evid. 702) (other citations omitted).  "As long as an expert stays within the reasonable confines of his subject area, a lack of specialization does not affect the admissibility of the expert opinion, but only its weight."  *Ho v. Michelin N. Am., Inc.*, No. 11-3334, 2013 U.S. App. LEXIS 6318, at *14 (10th Cir. Mar. 29, 2013) (quotations, citation, and alterations omitted).  Nevertheless, expertise in one subject does not necessarily mean the expert will be qualified to testify on all issues that could

arise from that subject.  For example, having knowledge about finance and securities does not necessarily make one an expert "about whether a particular security was counterfeit or not." *Rambus Inc.*, 254 F.R.D. at 604 (citation omitted).

The court in *Rambus* recognized this distinction.  In that case, the expert had a strong background in electrical engineering that qualified him to testify about "whether a product embodie[d] a claimed invention or possibly whether a product is coextensive with a claimed invention." *Id.*  He also could "aid the jury in understanding the performance value provided by a claimed invention." *Id.*  The court concluded, however, that his expertise did not qualify him to opine "on why particular products [were] commercially successful." *Id.*  He lacked the background to separate out the influence of the external factors in comparison to the patented features. Moreover, his methodology was faulty. *Id.* at 605.  The court therefore concluded he could only testify about the technical aspects of the invention. *Id.*

Similar to the expert in *Rambus*, Dr. Neikirk and Dr. Leeb have a strong background in electrical engineering.  They are well-qualified to testify about the technical aspects of the '442 Patent and the products that incorporate the patented features.  Such backgrounds, however, do not qualify them to testify about the nexus between the patented features and the products' commercial success, as is shown by the analytical deficiencies noted above.  The deficiencies cannot be corrected merely by cross-examination because Lutron has failed to show these experts have the requisite knowledge and experience to opine on this nexus issue.  There is no basis to conclude that their expertise or experience would provide any help to the jury or the court in addressing these issues.

Moreover, the methodology employed by them does not meet Rule 702 standards.[8]

**B.     Testimony about Copying**

Evidence of copying is another factor that may show a claimed invention was not obvious, as long as there is "a nexus between the copying and the novel aspects of the claimed invention." *Wm. Wrigley Jr. Co. v. Cadbury Adams USA LLC*, 683 F.3d 1356, 1364 (Fed. Cir. 2012) (quotations omitted).  The Federal Circuit has cautioned, however, that "[n]ot every competing product that arguably falls within the scope of a patent is evidence of copying.  Otherwise every infringement suit would automatically confirm the nonobviousness of the patent." *Iron Grip Barbell Co., Inc. v. USA Sports, Inc.*, 392 F.3d 1317, 1325 (Fed. Cir. 2004).  Instead, Federal Circuit "'case law holds that copying requires evidence of efforts to replicate a specific product.'"  *Metso Minerals, Inc. v. Powerscreen Int'l Distrib.*, No. 2011-1572, 2013 U.S. App. LEXIS 9645, at *22‒23 (Fed. Cir. May 14, 2013) (quoting *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1246 (Fed. Cir. 2010)).  Such evidence "may be demonstrated through internal company documents, direct evidence such as disassembling a patented prototype, photographing its features, and using the photograph as a blueprint to build a replica, or access to the patented product combined with substantial similarity to the patented product." *Wyers*, 616 F.3d at 1246 (citations omitted).  Importantly, the court may look at the actions of other Lutron competitors, and not just the actions of Crestron, when evaluating this factor.  *See Ecolochem, Inc. v. Southern Cal. Edison Co.*, 227 F.3d 1361, 1380 (Fed. Cir. 2000) (noting the copying efforts of "at least two competitors").

---

[8]  This does not mean that Lutron is precluded from introducing evidence about commercial success through other witnesses, but it may not bolster employee statements and Lutron press releases through the testimony of Dr. Neikirk and Dr. Leeb.

Dr. Neikirk points to this type of evidence in his report.  He states that other Lutron competitors have had a RadioRA product at their work site as they have tried to develop their own radio frequency product.  Moreover, internal Crestron documents suggest that Crestron may have actively tried to copy features of Lutron's products or business.  Dr. Neikirk asserts in his report this provides "strong circumstantial evidence that Lutron's competitors have attempted to copy *aspects* of Lutron's RadioRA products."[9]  Neikirk Expert Report, at 55 (Dkt. No. 555) (emphasis added). This statement is problematic because an attempt to copy "aspects" of a product does not inform the court whether those aspects include the relevant claimed invention.  Part of the alleged competitor copying focused only on the RadioRA dimmer.  While the dimmer is an aspect of the '442 Patent, it does not practice the full apparatus claims.  Moreover, as stated above, it is covered by more than one patent, including the '103 Patent that is specific to control devices.  Thus, the cited evidence fails to establish a basis for Dr. Neikirk to opine that there is a nexus between the alleged copying and the novel aspects of the '442 Patent.  Dr. Leeb's opinion offers no further foundation to establish this nexus, because he simply confirms what Dr. Neikirk stated.

This deficiency, however, is based on a lack of foundation rather than a lack of qualifications or poor methodology.  Indeed, as experts in electrical engineering, both are well-qualified to look at the features of competitor products to determine whether those products copy a Lutron product and embody the novel aspects of the '442 Patent.  The court disagrees with Crestron that such evidence is within the purview of a lay jury because establishing a nexus goes beyond simply determining whether competing products look the same or have some of the same features. Consequently, if Lutron is able to establish a sufficient foundation at trial, the court concludes that

_____

[9] Dr. Leeb reviewed Dr. Neikirk's analysis and concurred that the evidence supports copying.

Dr. Neikirk may testify about copying.[10]  If sufficient foundation is not laid, then Dr. Neikirk's opinion on copying will be inadmissible.

### CONCLUSION

For the reasons stated above, the court DENIES Crestron's motion for summary judgment on the '442 Patent.[11]  The court GRANTS IN PART and DENIES IN PART Crestron's motion to strike the testimony of Dr. Neikirk and Dr. Leeb.[12]  The court grants the motion to strike with respect to the experts' opinion about the nexus between the '442 Patent and the commercial success of Lutron's products.  The court denies the motion with respect to copying.  Lutron, however, must lay sufficient foundation to show a nexus between the alleged copying and the novel aspects of the '442 Patent before Dr. Neikirk's opinion on copying is admissible.

DATED this 12th day of September, 2013.

BY THE COURT:

Clark Waddoups
United States District Judge

---

[10]  Because Dr. Leeb merely concurs with Dr. Neikirk's opinion, whether he will be able to testify on this issue also depends on whether his testimony would be duplicative.

[11]  Dkt. No. 424.

[12]  Dkt. No. 555.